and Kathy L. Lanier. Mr. Gura, for the appellants. Ms. Johnson, for the appellees. Mr. Gura, good morning. Good morning, Your Honors. May it please the Court, Alan Gura for the appellants, and I will reserve three minutes of time for rebuttal. Outside this courtroom, people can debate whether carrying guns for self-defense is a good idea or a  thankfully much simpler. Does anyone need a good, police-approved reason to speak, to worship, to vote, or to make family planning decisions? And what if the law precluded nearly everyone from demonstrating that they deserve to do those things? Is there such a thing as a fundamental right of the people that you can exercise only when the police chief thinks you have a good reason to do so, which, by law, almost no one may have? The answers to these questions must be no. The government cannot ration constitutional... The answers to these questions are dictated by precedent. That's a fine introduction, high-minded, but we have to follow precedent, right? And the Supreme Court tells us in Heller that the Second Amendment right is most acute in the home. That suggests that it's less acute outside the home. And yet you're arguing for an extension of what was granted in Heller outside the home. So... Actually, Your Honor, we're not arguing for any extension beyond what Heller had already told us. The Second Amendment... Well, deal with the most acute language, because that's the most obvious point about Heller that we have to deal with. The government has greater regulatory interests in all constitutional rights when we're talking about activity that extends outside the home. As the Seventh Circuit acknowledged that in the Morvie-Madigan case, for example, the right to intimate relations is one that's going to be less subject to regulations inside the home than outside the home. And we are not suggesting that there is some kind of absolute right to carry a gun that is beyond the government's reach. We acknowledge that the government can regulate time, place, and manner when it comes to exercising Second Amendment rights outside the home. But here the question is not one of regulation. It's one of outright prohibition, because what this law says is that although the right of the people is one that we're talking about, the right of the general community, by definition, very few people will ever be able to exercise it, and only when the police chief thinks they have a good reason to do so. The question is, what does it mean to have a right? Are rights something that the police chief gets to dispense when she believes you deserve to be... Well, it's not an outright prohibition. I mean, there are people who qualify for this, right? Why isn't it like a time, place, or manner regulation? Because it is a prohibition for the people who do not get the permit. It's not a regulation... Well, that's always the case. If you set standards and you don't meet them, it's a prohibition. But it's not a total prohibition. There are many people who have. There are not many people who have obtained this permit, but more to the point, Your Honor, this is something that precludes access to the right at all times, at all places, in all manners, and presumptively for the majority of the people in the District of Columbia. This is not a law that tells people... But you recognize the government has a greater interest in regulating firearms outside the home than it does inside the home. Yes. C. Heller, right? Sure. The question is, what is the extent of that? You claim that it's a total prohibition. That seems overblown to me. It amounts to a destruction of the right because the concept of a right is the concept that people have some sphere of autonomy, that they get to exercise some activity as their prerogative without needing the government's approval for the activity. You only protect things as rights when the government would. There's a long history here of courts sustaining bans on concealed carry, right? Sure. There's a long history, and the court in Heller cited to some of those cases. And we do not challenge the concept that if the city council wished to ban concealed carry, it could do so, but that's not what it did here. The city council did not ban a matter of carrying like concealed or open carry. The city council has restricted all carry. The law says that you may not carry openly or concealed unless you have the license. The license happens to be reflective of the city council's choice that to the extent that they would even symbolically tolerate the right, they would tolerate it in a concealed fashion. So you're challenging the open carry? No, we're not challenging any matter of carry regulation here at all. We acknowledge that the city can regulate the matter of carrying guns. Heller made this very clear, as does a great wealth of precedent that it cited. The city can say, we don't like concealed carrying or we don't like open carrying. What they cannot do is, as Heller also reflected, they cannot destroy the right entirely by saying you can't carry openly or concealed. That amounts to a disruption of the right. Now, here we have the city making this choice as to how people can carry. That's not in dispute. If they wanted to change their mind and... There's a lot of ink poured in the briefs on the empirical studies and the reliability of them. I don't want to use our time here to wade into that. I think it's a very well briefed. Let me give you a hypothetical. Let's imagine there was ironclad empirical evidence that showed that allowing more carry, either concealed or open, inexorably led to an increase in violence. It's a hypothetical. I realize that's a contested, but play with me on the hypothetical. Let's imagine that the social science data showed, no, absolutely, if a jurisdiction allows open carry or concealed carry more broadly than the district does here, it will, it does and it will lead to an increase in gun violence. That's the hypothetical. Sure. What would we do with that information in analyzing the second amendment of right that you're claiming here? It wouldn't be for this court to do anything. It would be for two-thirds of each house of Congress and three-quarters of the state legislatures to amend the Constitution at that point and remove this very dangerous and ill-conceived right from our Constitution. But we cannot say that the city council can abrogate any constitutional right just because there's social science that tends to show that it is harmful. The Supreme Court at McDonald made this very clear. All constitutional rights are controversial. They all have some public safety implications. And we've seen many articles that have said the exclusionary rule is a terrible idea. Free speech has a cost. There's really nothing that limits the government's action that one can't say, well, there's a social science study here that says that the city council really should get its way in the interest of public safety and therefore we're going to skip over the constitutional right. If that's the approach that we were to take, then we wouldn't have any rights left. And I only have... ...factual circumstances, carrying Judge Griffith's hypothetical further, under which the district's law might not survive strict scrutiny? I don't believe that the district's law survives any level of scrutiny, including... Yeah, but that's on, at least I suspect that's on your understanding of the factual situation in terms of the risks posed. Oh, yes. Judge Griffith's hypothetical further, suppose that the invalidation of the district's law would cause, would clearly cause, 10,000 deaths of innocent people in the district each year. Well, if that were... Would that survive strict scrutiny? The law would still not survive strict scrutiny, Your Honor, because you would still be engaging in a situation where the city has defined the interest. Here the city has defined its interest not as anything more than rationing the right itself. They've defined the right as the thing to be rationed. And while the city has a public safety interest in reducing deaths, in reducing injuries and accidents, that much is granted. There cannot be a governmental interest in suppressing a right just because the right itself is inherently thought to be a social evil. I'm in my rebuttal. Yeah, I mean that, if the district's law were simply the total number of guns must be reduced by 90%, I would see your point. But the law, in fact, does have categories, and some carrying it regards as okay and some, most of it, not okay. So I don't think you're in the category of a restriction that depends entirely on the danger from the right itself. While the law does not specify a numerical quota, the law does state that good reason will only exist for a substantial minority. I understand that, but all the rules under which rights get constrained involve something like that, it seems to me. I don't see how you distinguish this from those cases. Well, Your Honor, it would seem to me that the city simply cannot declare that a right, they have redone the framers balancing, and they have determined that this right will cause an amount of harm that they wish not to tolerate, and therefore they're going to pick a number out of a habit. If you're saying that the approach under which the district argues the case, which is largely with Heller 1, that may well be, but the train has left the station, at least in the District of Columbia on that. Well, Your Honor, in Heller 2, the court did say that the means chosen may not be substantially broader than necessary to achieve the interest. Yes. So what's the interest? If the interest is we simply don't want to have guns because we don't like guns, that's not a valid interest. So there's nothing, we're not, Heller 2 is identified the right, we've identified the interest, and we're balancing those two factors. But once the district says our interest is the negation of the right itself, it's not making sure that people... What if the D.C. regulation defined good reason in a way that you'd get the license if you lived in a dangerous neighborhood? That would still be irrational, Your Honor, because we don't know... What's irrational about that? People are hurt in so-called safe neighborhoods as well, and also people like to walk about the city. I might live in a great neighborhood and maybe I want to go out and visit a friend who lives in a neighborhood that's not so nice. I mean, the fact is that the Second Amendment is not limited to bad neighborhoods. Of course, people may want to exercise Second Amendment rights when they perceive that there's greater harm, but the constitutional rights we have, we had this in the Mills case, in this very court, Your Honor, the city had checkpoints in Northeast, and they felt that they could stop traffic and ask people at the security checkpoints going about their business whether or not, you know, what they were doing there, and this was all supposed to reduce violence, and this court struck that down. The Fourth Amendment allows people to travel freely throughout... What the hell to recognize is that there are longstanding regulations that ban weapons, the individual carry of weapons in various places, schools, government buildings, maybe churches. What's the principle behind that restriction? The Supreme Court has not told us the rationale for that, but one can be easily surmised, and I would imagine that there are two factors that might come into play, and of course, it's not an issue in this case and it's not one that's been litigated reactively, but I would posit that there are two rationales for that. Number one, the use of firearms in some of these areas would cause some impact on society that's vastly greater than even the terrible impact that ordinary misuse causes, and second, in a lot of these places, the government has taken some proactive step to assure people's security. If you go to the airport, you can't carry a gun... But why can't those same rationales be applied to safe neighborhoods, right? No history of serious crime here, well, police brandishing firearms there would upset the neighbors, but if you can show that you are in an unsafe neighborhood, you can have it. Well, by that measure, Your Honor, we could expect the city would resist the argument that people have some kind of constitutional right to expect police protection or there's some kind of public duty under tort law to provide police protection. There are no such things under our system of law. If you get hurt and the police weren't there... I'm just following your lead from saying what was significant about the places that we recognize. Those places are exceptions to the rule, and the exception proves the rule, Your Honor. The fact that the Supreme Court told us that there are going to be specifically delineated exceptions tells us that there is a rule there, and the general rule is, if you're not in some place where we can think of a rationale, and they haven't explained the rationale, and we can all explore it,  and the rule must apply broadly in public, and the district has created exceptions, and none of those are at issue in this case. As far as I know, many or perhaps even all of those are fine. I don't know, but there are exceptions. They don't swallow the rule. They prove the rule. Your Honor, I would hopefully get my three minutes of rebuttal time. Thanks. Thank you. Ms. Johnson? Good morning. May it please the Court. Holly Johnson for the District of Columbia. There are a lot of really interesting issues regarding the history, and I would like to get to that in my time here today, but I want to begin by noting how other circuits have approached this question by assuming that the good reason standard implicates the Second Amendment but holding that it's not close enough to the court. Other circuits have used the good reason standard. The good reason standard in precisely the same iteration as the district, there are four. Four. And how many states are there in the union? There are still 50. Yeah, 50. But they do make up a quarter of the population. It's not an outlier, and so it certainly is not as the Heller 1 ban on carrying was. That certainly undercuts your argument that it's necessary, right? If we get to levels of scrutiny, that it's necessary to do this, that you have to have the good reason standard. Forty-six, maybe 47 other jurisdictions have looked and said otherwise. Let me ask you a question. Under your regulation, let's imagine a woman who comes home late each night to a dangerous neighborhood. She knows that it's dangerous. She fears an attack at any moment, and she has several neighbors who have been attacked. Under your regulation, she would have to wait until she was threatened or robbed or attacked before getting to carry. And you're saying that's not a substantial burden on her right to self-defense? Got to be attacked first. Oh, I have two responses to that. You don't have to get attacked first. You have to show a particularized need, and, indeed, there's a standard permit. But living in a dangerous neighborhood is insufficient, right? You've got to show that either you've been attacked or you've been threatened, something specific, right? You do have to show something specific to yourself. What about someone who's never been personally threatened, so they have no right of self-defense? You've got to be attacked the first time. And why the first time? Why didn't the D.C. Council decide you've got to be attacked twice? These are the kinds of questions that are appropriate when we get past the preliminary injunction stage and actually look at the evidence regarding the application of intermediate scrutiny. But the right here that they're claiming, as I understand it, is that every person in this country has a right to defend themselves against the first attack. And that is where their fallacy lies. That is where the fallacy lies, because the Second Amendment does not— Let me say it. So you're saying there is no right under the Second Amendment to defend yourself with arms from a first attack. The right— Is that what you're saying? I can't—it depends on a lot of circumstances. There's no right under the—depending on where you are. So there might be a right to defend yourself from attack the first time in the home. There might be a right to defend yourself from a first time under attack in the countryside. But not in the city. That's a cert, excuse me. That's a cert. Judge Griffith, I understand your frustration with that, but we have to look at the history of the time the Second Amendment was codified. And Blackstone and James Wilson take a different view than you do of the statute of Northampton. That's a pretty compelling reason that maybe there's something missing in the history. But I have to contest, Blackstone is directly on point with what we say. He says that the offense of riding or going armed with dangerous, unusual weapons is a crime against the public peace. Dangerous, unusual weapons. Were there any cases from colonial times involving the application of that statute? Not that we've found. I mean, not so far with the history. What would the natural inference from that be? That in colonial times, and indeed up until the mid-1700s, precedent was not— the principle of stare decisis is not— I mean, I've read decisions of colonial courts. They wrote them. So the assumption at this point would be that people were not challenging those laws. I don't think public hearing was as common as plaintiffs want to suggest, and certainly not in cities. And the burden is on the plaintiffs to prove that the conduct— Here's the statute. It's lasted 600 years, well, only 450 up to colonial times, from colonial times. And it's applicable all over the colonies. And it never generates a single case decision. That suggests it's not in very active employment. All I know is that it's not like it had just disappeared. This wasn't a blue law that was on the books for hundreds of years before. It was reenacted by colonial—in the framing area, by the colonies and by the states. And it was very specific at the time. I mean, indeed, five years before he wrote the Second Amendment, James Madison presented one of these statutes written by Thomas Jefferson to the Virginia Assembly. And if you read that Virginia statute, it's really impossible to harmonize with plaintiffs' interpretation of what was barred, because it included exceptions for peacekeepers. The difference is over dangerous and unusual as opposed to common. But what do you do with Heller? Heller says, by the time of the founding, it was understood as an individual right protecting against both public and private violence. What do you do with that? You say, but not in cities. No, I don't. I say public and private rights has nothing to do with inside the home and outside of the home. Public and private rights have to do with a collective right and an individual right. It's not violence. It says public and private violence. Yes, and it's referring to violence against the state, in which there's a militia context, and violence against the individual. No, no, no, that's not what it says. By the time of the founding, it was understood as an individual right protecting against both public and private violence. That's Heller. But Heller 1 is not referring to carrying outside the home. And I'm sorry, this was not an issue that was briefed, but I've read the materials. I've read materials from that time. And I don't recall where it's from. Perhaps it's from the early cases, the 1800s cases, the state cases involving whether it's a collective right or an individual right. But it specifically refers to public and private violence as collective versus individual right. That is not referring to public being outside the home and private being inside the home. Also, I think you've lost the collective-individual distinction. Of course we have. We're not arguing the collective-individual. What I'm saying is that that's what Heller was talking about. I'm responding to the Heller. Yeah, Heller had no occasion, whatever, to draw a line against bearing arms outside the home. That's precisely so, yes. So in a fine rhetorical flourish, Justice Scalia referred to the most acute area for the need for the Second Amendment. It was referred to part of the home, but there are a lot of places in the opinion where the key core interest of the provision is expressed without any limitation of the home. You know that. Yes, yes. Heller is not limited to the home. I mean, the Heller decision was limited to the home. But Heller does not foreclose a right to carry outside the home. It simply did not address a right to carry outside the home. And I have two responses. I do want to get back, Judge Griffith, to your comment about dangerous and unusual because I think that's critically important. There is no question that the Northampton laws that came to America that were the law of the land at the time of the framing applied to handguns. These are not outside of the scope of Northampton. And I do think that's critically important because Blackstone was talking about handguns, as was every other treatise. And in our brief, we put treatise after treatise that refers to guns. Indeed, Blackstone refers to dangerous or unusual weapons. And I don't believe anyone would suggest that guns were not dangerous in 1791 and that they're not dangerous today. But I would also like to address this question of the scope of carrying historically because it is important to note that the framers were very practical people. And historically, public carrying, as Mr. Gura has acknowledged, was always treated differently than carrying inside the home. Heller 1 instructs us that the Second Amendment codified an interest balancing by the people. They already balanced the interest. And public carrying has always been balanced with public safety. If you look at sort of the three contexts that we have historical information about, we have the home where the need, as Heller 1 states, is most acute and where the public safety risks are lower. We have the countryside where the need for self-defense was more acute because there was no police force, and the public safety risks were smaller. And then you had the cities, and there's this rich history of regulating public carrying, indeed banning public carrying in cities because of the risks to public safety. But I see my time is winding down, and I do want to take a step back and look at the big picture because I think that's critically important here. This is a preliminary injunction appeal. So the question here is whether the plaintiffs are likely to prevail on the merits and whether they are so likely to prevail and have demonstrated such a great risk of harm to themselves to justify banning enforcement of this important public safety law for everyone. Just to get your position clear, are you saying that the district interprets this statute and the regulations under it as allowing someone who isn't in the business of transporting money around the city, in those few explicit exceptions, to get a permit by showing what exactly? What's the minimum showing that would assure getting a permit? You seem to have very clearly answered Judge Griffith's hypothetical, not enough. So what would you need? You need a clear threat by an actual perpetrator to the applicant? I don't know if it would have to be a specific perpetrator. It needs to be a special need for self-protection distinguishable from the general community as supported by evidence. Give me a hypothetical. I could give you a hypothetical. Of course, someone who's being stalked. Of course, somebody who has had threats. How about stalked by a rather mild-mannered person who showed no evidence or readiness to inflict violence? We don't know yet. We're coming up with our first challenge in the D.C. Court of Appeals as a judicial process to address this, and they will apply the standards that are applicable here. Does the district keep a log of the grounds offered for issuing these permits, building up a sort of common law of when it's to be granted and when not? I don't know whether the police force does. I'm sure the Concealed Permit Licensing Board keeps its own records. Obviously, they're not public for public safety reasons. How about is there any evidence of how many attacks, physical attacks in the district, are actually first-time attacks as opposed to second-time attacks? Apparently, that's a legally significant distinction for the District of Columbia. I wonder what sort of evidence they relied on to know if someone gets attacked. I don't know. The plaintiffs have offered, again, no evidence as to the risks that are posed to them. And again, we are at the preliminary injunction appeal stage. No, I'm just saying the district requires one of the things that you can show is that you have been attacked before. Or threatened, yes. Or threatened before. I'm just wondering what the data is on that in terms of how many attacks that occur in the district in the last week were first-time attacks as opposed to were repeat attacks. I don't know, and that may well come out on a full record. Again, this is a preliminary injunction appeal. The district has already actually proffered quite a bit of evidence in comparison to basically no evidence on the side of the plaintiffs. And I would note that this court need not and should not rule on the scope of the right today. Indeed, it should not even rule definitively on the level of scrutiny. In Gordon v. Holder, this court held that premature resolution of difficult constitutional questions is undesirable. And at this point- No, but in Holder 2, we have a roadmap here, right? If we think this is a core constitutional right and it's substantially burdened by the regulation, then there's irreparable harm in someone's core constitutional rights being substantially burdened. That's kind of what our job is. Okay, so core constitutional right is one of the ways of looking at it. Substantially burdened is another way of looking at it. If you look at Schrader- I'm looking at Heller 2. Absolutely, but Heller 2 talks- I mean, there's different ways that you look at different restrictions. So Heller 2 dealt with the core- already the core right of home possession. That was already in play. The court didn't even need to look at that. So it looked at how heavily that was burdened. That's definitely one way of looking at it. Schrader, on the other hand, definitely there was a substantial burden on the core right, but this court held that the individuals were unlikely to be in the core of the Second Amendment because they were not considered law-abiding people. I will note, by the way, that the Second Amendment only says- But that seems to exclude it from the core, which I think is, to the extent core and non-core are critical, I think that's a suitable reading of Schrader. I believe that is a suitable reading of Schrader, and what every court who has looked at this question has done unanimously, what every court has done is held that the right to carry outside the home was so heavily regulated in 1791 that it cannot be considered the core. It was banned outright in some places. I don't know where your unanimity comes from. Certainly not the Seventh Circuit. No, dealing with the good reason standard. I apologize. Certainly- The difference between the good reason standard and absolute ban is it exists, but it's subtle. Well, I would actually- I would contest that it's not that subtle. I want to point this court to an analogy, if you'll bear with me, to Humanitarian Law Project, because that was a strict scrutiny case, and in that case the court looked at the exceptions to the ban on providing material support to foreign terrorist organizations in the form of speech. And the Congress had made exceptions for medical information and for religious information, and it did not hold that those exceptions created narrow tailoring because that information was less likely to cause injury than other humanitarian information. It held that that created the tailoring because those exceptions were geared towards trying to protect the value at the heart of the First Amendment. Well, the value at the heart of the Second Amendment is self-defense. I mean, that's what's valued. Now, this doesn't mean the founders always put self-defense ahead of public safety. They clearly didn't. But what the good reason standard does is, like the exceptions in Humanitarian Law Project, it creates an exception to a ban on carrying that is geared towards those who most need self-defense. It is very different from a flat ban on carrying. I'm sorry, you said most- why should one- following the plaintiff's argument here, why should someone show a need for self-defense? Isn't the idea that that's an inherent right, that I have an inherent right to self-defense? Isn't that the core of Heller? And therefore, why should I have to show a need for that before exercising that right? Because self-defense is the value. The core right is the right to bear arms, and that right is subject to nuance. That right is subject to the exceptions that existed in 1791. So you're saying I have a right to defend myself, just maybe not with a gun. The natural right of self-defense, that's what Blackstone talks about, is not a right to carry a gun. That's the natural right to use force against someone to hurt someone if they're trying to hurt you. That is different. That's the right to self-defense. And we know the right to self-defense does not trump public safety always, because Heller says that felons in the mentally ill can be disarmed. They might have a need for self-defense. What about the woman in my hypothetical, though? She lives in a dangerous neighborhood. She's never been directly threatened. She's scared, and she can't get a permit in D.C. Her right to self-defense, then, is limited to running, maybe, or maybe she learns martial arts. But you're saying her right to self-defense does not include carrying a handgun in her purse. What I am saying is that the plaintiffs have not met their burden at this stage of litigation. No, no, I'm asking you. Yes, I think that's right. We're trying to understand the scope of the right. Yes, if she can't show a special need, just like in 1791. In 1791, by the way, a special need wouldn't have even given her a right to carry in the city. In the 1800s, a lot of the public, almost a third of the population, recognized that there was a reasonable exception that could be made for people who had a most acute need for self-defense. And that's where these good cause laws began. They are, in fact, longstanding. And, again, Heller instructs that longstanding laws are presumptively lawful. The plaintiffs would then have to come and prove that those infringed substantially on a right that existed under the Second Amendment. That is their burden, and they haven't proven that. We have shown, what, 10, 12 different treatises, and the treatises where the law lay at the time, that cannot be most naturally read to only prohibit carrying when you were doing it with menacing conduct. We know that because those laws prohibited concealed carrying. Plaintiffs conceived that. So we know menacing conduct wasn't required, and it doesn't make any sense to say that you could only not carry with evil intent because the laws included all of these exceptions for peacekeepers. In fact, these treatises, these same treatises, say that there is no right at that time to publicly carry for self-defense. And if they're saying you can't publicly carry for self-defense, how can you read these laws as saying that there was an evil intent requirement before the law applied? Again, this is the historical backdrop. You need to wind it up. I will wind up right now. Thank you, and I appreciate your indulgence. This is the historical backdrop. But this Court, history is young. It's still being developed. If you look at the difference between our briefs in Run 1 and Run 2, you can see. What we ask is that this Court look to the plaintiff's proof now and consider that they have not made the high showing for the extraordinary relief they are seeking. And we ask you to affirm Judge Kahler-Catelli's ruling. All right. Thank you. Does Mr. Gura have any time? Why don't you take three minutes? What about the treatises, Mr. Gura? There is absolutely no historical evidence supporting this type of law at the time of the framing or until any time until the 20th century. The fact of the matter is that, yes, concealed carrying might have been prohibited, but that's because the society at the time preferred open carrying. The one time where a court considered complete bound carrying, that ban was struck down in State v. Nunn under the Second Amendment. Even before the Civil War, the Second Amendment was used to strike down a state law that forbade the carrying of arms. Now, the one thing I've not seen in the briefing from the District, aside from this rich history of supposed urban arms-carrying prohibitions that simply does not exist, I mean, you can say it, but that doesn't make it so. The other thing that's curiously missing, and I've searched for this and I didn't hear it today either, is what exactly does it mean, according to the District, to bear arms? I mean, right, this is the constitutional text we're supposed to be understanding here. The Supreme Court has a definition. It has a definition that it had to give because the District in Heller 1 had a meaning of bear arms. They said bear arms was militaristic conduct that only pertained to militia activity and, therefore, it had this collectivist hue to it. And the Supreme Court had to decide the case, and in deciding the case, the Supreme Court gave us the following definition of what it means to bear arms, and this is actually by Justice Ginsburg in an earlier case, Muscarello v. U.S. To bear arms in the Second Amendment, per the Court, is to wear, bear, or carry upon the person or in the clothing or in a pocket, so it includes concealment as a matter, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person. Close quote. That is binding, controlling precedent here. And so long as you have the right to be armed and ready in case of a conflict with another person, the law that says you may not be armed and ready because we think that's a bad idea unless the police chief happens to give you a dispensation cannot possibly be constitutional. And I'd like to address this other argument we sometimes see. We didn't see it so much here about this alleged distinction between the core right and the non-core right. I think we have to look at McDonald and how McDonald opens in explaining Heller, and this is the Supreme Court's language. In Heller we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a D.C. law that banned the possession of handguns in the home. The syntax is very clear. There is a right to carry a gun for self-defense, as Heller tells us. It was applied in the home context, but that's not to mean that it was limited to the home or that it can't be conceived of a place. I think the D.C. Council acknowledged that. The D.C. Council? That Heller 1 did nothing to, the language of Heller 1 did nothing to limit the right to part their home. Yes, but then they go on in practice to say that you don't really have that right, as we understand rights to exist, because the police chief gets to tell you whether you can do it. By the way, the people don't actually have this as a prerogative within their sphere of action. Thank you, Your Honors. I submit. All right. Thank you.
judges: Henderson, Griffith, Williams